[No. A126130. First Dist., Div. Five. May 28, 2010.]

BENITO GARCIA, Plaintiff and Appellant, v.
DEPARTMENT OF MOTOR VEHICLES, Defendant and Respondent.

## COUNSEL

Joseph Morehead for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, William T. Darden and Jennifer G. Perkell, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**BRUINIERS, J.**—The Department of Motor Vehicles (DMV) suspended Benito Garcia's (Garcia) driving privileges for refusal to submit to, or failure to complete, a chemical test for blood-alcohol content (Veh. Code, § 13353, subd. (a)(1)).[1] Garcia sought an order from the trial court, via petition for writ of administrative mandamus (§ 13559, subd. (a); Code Civ. Proc., § 1094.5), directing the DMV to set aside the suspension. He appeals the trial court's denial of his petition. Garcia argues that he did not refuse a chemical test of his blood-alcohol content. We affirm.

---

[1] Unless otherwise noted, all further statutory references are to the Vehicle Code.

# I. Factual and Procedural Background

## A. Arrest[2]

On December 6, 2008, at approximately 12:24 a.m., San Francisco Police Department (SFPD) Officers McNamara and Khan were on duty and driving their patrol car southbound on Mission Street. McNamara observed a black Ford Explorer driving ahead of him that, without any warning or signal, swerved over the center, double yellow line. After the Ford returned to its lane, it slowed from about 20 miles per hour to about seven miles per hour. The Ford then sped back up to about 25 miles per hour. McNamara pulled the vehicle over.

McNamara contacted the driver, later identified as Garcia, and asked him why he was driving as he was. Garcia said that he did not understand. McNamara smelled the strong odor of an alcoholic beverage coming from Garcia's breath and observed that Garcia was chewing something. McNamara told Garcia to remove what he had in his mouth. After asking why and again being ordered to remove it, Garcia eventually removed a piece of gum from his mouth. McNamara asked Garcia if he had been drinking before driving. Garcia said that he had not. However, McNamara observed that Garcia's eyes were bloodshot and that Garcia was sweating, even though it was cold outside. McNamara recognized these as objective signs of alcohol intoxication.

McNamara had Garcia exit his vehicle to perform field sobriety tests. Before beginning the tests, Garcia stated that he was in good health and did not have any physical ailments. Garcia also again stated that he had not consumed any alcohol or other drugs that night. McNamara advised Garcia that each test would be explained and demonstrated and he should let the officer know if he did not understand any instructions. McNamara noticed that Garcia was still chewing gum and again told him to spit it out. Garcia asked "why?" He was told that it was necessary for his mouth to be empty for the tests. When Garcia began to argue, McNamara demanded that he remove the gum. Garcia paused, but then removed the gum from his mouth. After each test was explained and demonstrated, Garcia indicated that he did not understand. After repeated explanations, he eventually attempted to perform each test. Garcia was evasive and repeatedly mentioned that he knew SFPD officers and started listing their names. Garcia also asked if he could

---

[2] Our factual summary of the arrest is taken from the police report, which is part of the administrative record.

just be driven home. Based on observations of Garcia's driving, his symptoms of alcohol intoxication and his performance on the field sobriety tests, McNamara determined that Garcia was driving while under the influence of alcohol and was unable to safely operate a motor vehicle. Garcia was arrested at 12:43 a.m.

While in the patrol car and still at the scene, Garcia was advised that he was required by law to submit to either a blood test or a breath test and that he needed to choose one. Garcia became very evasive and asked McNamara to look in his wallet for a list of SFPD officers he knew. Garcia was asked several more times which test he wanted to take. Garcia asked what the officer recommended. McNamara told Garcia that he could not recommend a test and that Garcia needed to choose. After several minutes passed, Garcia was told that if he did not decide, McNamara would decide for him. Garcia stated that was okay with him. McNamara told Garcia he would be taking a breath test. McNamara also advised Garcia that if he did not cooperate and perform the breath test as ordered, it would be considered a refusal and he would lose his driving privileges for a year. Garcia stated that he understood and would comply with the breath test.

Garcia was transported to county jail where he was first observed for 15 minutes, as required for the breathalyzer test. During those 15 minutes, Garcia did not place anything in his mouth, belch, or vomit. When Garcia was told to sit in the chair in front of the breathalyzer machine, he stated that he wanted to take a blood test. McNamara told Garcia that he believed Garcia was trying to stall the test to reduce his blood-alcohol content and that Garcia needed to comply or his conduct would be considered a refusal and he would lose his driving privileges for a year. Garcia sat down and began the test at 1:15 a.m. McNamara explained that Garcia needed to place his lips on the mouthpiece and blow strongly and steadily until the machine beeped. Garcia said that he did not understand. McNamara again explained that he needed to place his lips on the mouthpiece and blow steadily until the machine beeped. After receiving this explanation at least three more times, Garcia put his lips on the mouthpiece and blew for about one and a half seconds before stopping, without the machine beeping. He was told that he needed to try again and received yet another explanation of what was required. Garcia argued with McNamara for a few minutes and then was again advised that if he did not comply, it would be considered a refusal and he would lose his driving privileges for one year. Garcia said he would comply, but just stared at the mouthpiece. At 1:20 a.m., McNamara deemed Garcia's lack of cooperation a refusal to take a chemical test. McNamara ordered a phlebotomist, who arrived at 1:40 a.m. and obtained blood samples from Garcia at

1:50 a.m. The blood test revealed that Garcia's blood-alcohol content at the time of the test was 0.28 percent.

## B. *Administrative Hearing*

Garcia was served with a copy of the order suspending his driver's license for refusing to submit to, or failing to complete, a chemical test. Pursuant to section 13558, Garcia requested an administrative hearing before the DMV. The only contested issue at the hearing was whether Garcia refused to take, or failed to complete, a chemical test.[3] His testimony at the hearing was consistent, in most respects, with McNamara's report. For example, Garcia testified that McNamara informed him, at the time and scene of his arrest, that he had a choice of chemical tests and that if he did not take a chemical test he could lose his license for one year. However, Garcia also testified that when he was seated before the breath machine he felt "[v]ery nauseous" and that he requested a blood test at that time because he "thought [he] was going to throw up a little bit on the machine and [he] didn't think [he] could perform the test." When asked whether he told the officer that he felt nauseous, Garcia stated: "I believe I did." He further testified that he tried to blow three times and that "[he] couldn't make something trigger off, but [he] blew as hard as [he] could as far as the way [he] was feeling." Garcia testified that he signed the blood test request form to indicate his consent to take a blood test.[4] Garcia later testified that he never resisted or intended to refuse the blood test. He also admitted that he had consumed "maybe two or three" beers on the night in question but had not told the officer as much. Garcia later testified that he could not recall what he had told the officer regarding his consumption of alcoholic beverages.

The DMV hearing officer found that Garcia "did refuse or fail to complete the chemical test or tests after being requested to do so by a peace officer." The hearing officer stated: "Officer McNamara did not have a duty to provide a subsequent opportunity for a chemical test. [Garcia] was warned by Officer

---

[3] Before the DMV may suspend a driver's license for failure to submit to a chemical test, the DMV must make four findings: (1) the officer had reasonable cause to believe the person was driving a vehicle while under the influence of drugs or alcohol; (2) the person was arrested; (3) the person was told that if he or she refused to submit to, or did not complete, a chemical test his or her license would be suspended; and (4) the person refused to submit to, or did not complete, such a test. (§§ 13353, subd. (d), 13557, subd. (b)(1); *Hughey v. Department of Motor Vehicles* (1991) 235 Cal.App.3d 752, 757–758 [1 Cal.Rptr.2d 115].) Garcia stipulated to issues one, two, and three.

[4] The word "Refused" is also handwritten on the form, on the line designated "Signature of Person Being Tested." Garcia testified that this was not his handwriting. The hearing officer accepted that the word "Refused" had been written by an officer.

McNamara, before arriving at jail that if he did not cooperate and perform the breath test as ordered that Officer McNamara would consider it a refusal. [Garcia] had agreed to comply with the breath test. After attempting [the] test and being warned by Officer McNamara again that his noncompliance would be considered a refusal [Garcia] did not complete the chemical breath test. Signing the Blood Test Request by Peace Officer form at phlebotomist's request, for a forced blood draw, does not invalidate respondent's refusal." The hearing officer specifically found that Garcia's testimony was "not credible" because Garcia "testified to a different drinking pattern."

## C. *Mandamus Proceedings and Ruling*

Garcia then filed a petition for writ of administrative mandamus. After reviewing the administrative record and hearing argument, the trial court denied Garcia's petition. The trial court upheld the administrative finding that Garcia refused or failed to complete a chemical test. The court stated: "In exercising its independent judgment, the Court finds that the weight of the evidence does support the decision of the hearing officer. The Court further finds that the weight of the evidence supports the decision of the hearing officer that [Garcia's] testimony at the hearing was not credible. Further, this Court, in exercising its independent judgment in reviewing the record, also independently finds that [Garcia's] testimony at the hearing was not credible." In light of this credibility problem, the court stated that the hearing officer properly rejected Garcia's claim that he was incapable of completing the breath test because of nausea.

With respect to Garcia's argument that he had a right to change his mind and ask for a blood test, the trial court stated: "if a driver elects to take one of the three tests, he must complete the test or he will be deemed to have refused and failed to take it. (*Cahall v. Department of Motor Vehicles* (1971) 16 Cal.App.3d 491 [94 Cal.Rptr. 182]; *Quesada v. Orr* (1971) 14 Cal.App.3d 866 [92 Cal.Rptr. 640])." The court also observed: "The fact that [Garcia] may have ultimately submitted to a blood test does not save him from the consequences of his earlier behavior. Once the suspect refuses to take one of the required tests, there is no requirement that the officers thereafter give him a test when he decides he is ready. (*Zidell v. Bright* (1968) 264 Cal.App.2d 867 [71 Cal.Rptr. 111]; *Skinner v. Sillas* (1976) 58 Cal.App.3d 591, 598 [130 Cal.Rptr. 91].) ' "It is the initial refusal which forms the basis for the suspension of the driver's license." ' (*Payne v. Department of Motor Vehicles* (1991) 235 Cal.App.3d 1514, 1519 [1 Cal.Rptr.2d 528].) ' "Simply stated,

one offer plus one rejection equals one refusal; and one suspension." [Citations.]' (*Hildebrand v. Department of Motor Vehicles* (2007) 152 Cal.App.4th 1562, 1573 [62 Cal.Rptr.3d 234].)" Thereafter, the court entered judgment against Garcia. Garcia filed a timely notice of appeal.[5]

## II. Discussion

█ If a person is lawfully arrested for driving under the influence of alcohol, he or she is deemed to have given his or her consent to chemical testing of his or her blood or breath to determine blood-alcohol content. (§ 23612, subd. (a)(1)(A).) A driver lawfully arrested for driving under the influence of alcohol has the choice of a breath or a blood test, and the arresting officer shall inform the driver of that choice. (§ 23612, subd. (a)(2)(A).) "If the person arrested either is incapable, or states that he or she is incapable, of completing the chosen test, the person shall submit to the remaining test." (*Ibid.*) A person who refuses to submit to, or fails to complete, a chemical test under section 23612 is subject to suspension of his or her driving privileges, among other sanctions. (§ 13353, subd. (a)(1).) The officer shall tell the arrestee that his or her failure to submit to, or failure to complete, the required chemical testing will result in a fine and suspension or revocation of driving privileges. (§ 23612, subd. (a)(1)(D).)

Garcia raises two distinct arguments on appeal. Garcia argues that he did not refuse to take the breath test. Garcia also argues that he was entitled to change his mind and that his subsequent submission to a blood test negates his conduct with respect to the breath test. We address each argument in turn.

### A. Standard of Review

█ In ruling on a petition for writ of mandate following a DMV suspension order, the "trial court is required to determine, based on its independent judgment, ' "whether the weight of the evidence supported the

---

[5] Garcia originally appealed from the "[j]udgment after court trial," despite the fact that there had been no formal entry of judgment at that time. We later deemed Garcia's notice of appeal augmented "to correctly reflect that [Garcia] is appealing from a 'final order . . . denying the Petitioner's Writ of Mandate.' " The order denying the mandate petition is appealable as the equivalent of a final judgment because it was a final determination of the rights of the parties and no further action by the trial court was contemplated. (See *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 697–699 [107 Cal.Rptr.2d 149, 23 P.3d 43]; *Nerhan v. Stinson Beach County Water Dist.* (1994) 27 Cal.App.4th 536, 540 [33 Cal.Rptr.2d 10]; Code Civ. Proc., § 1064 ["[a] judgment in a special proceeding is the final determination of the rights of the parties therein"].)

administrative decision." ' [Citation.]" (*Lake v. Reed* (1997) 16 Cal.4th 448, 456–457 [65 Cal.Rptr.2d 860, 940 P.2d 311]; see *Hildebrand v. Department of Motor Vehicles, supra*, 152 Cal.App.4th at pp. 1567–1568 (*Hildebrand*).)[6] "In making that determination, the trial court had to 'weigh the evidence and make its own determination as to whether the administrative findings [were] sustained.' [Citation.]" (*Gananian v. Zolin* (1995) 33 Cal.App.4th 634, 638 [39 Cal.Rptr.2d 384], last brackets added.) "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 [85 Cal.Rptr.2d 696, 977 P.2d 693].) "The review shall be on the record of the [administrative] hearing and the court shall not consider other evidence." (§ 13559, subd. (a).)

On appellate review, this court reviews " 'the record to determine whether the trial court's findings are supported by substantial evidence.' " (*Lake v. Reed, supra*, 16 Cal.4th at p. 457, quoting *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242].) Issues of law are reviewed de novo. (*Hildebrand, supra*, 152 Cal.App.4th at p. 1568; *Brierton v. Department of Motor Vehicles* (2005) 130 Cal.App.4th 499, 508 [30 Cal.Rptr.3d 275].)

B. *Did Garcia Refuse, or Fail to Complete, a Chemical Test?*

■ We reject Garcia's argument that suspension of his license was improper because he did not refuse a chemical test. "The question whether a driver 'refused' a test within the meaning of the statute is a question of fact. [Citation.]" (*Cahall v. Department of Motor Vehicles, supra*, 16 Cal.App.3d at p. 497 (*Cahall*).) To comply with the law, a "driver should clearly and unambiguously manifest the consent required by the law. Consent which is not clear and unambiguous may be deemed a refusal." (*Carrey v. Department of Motor Vehicles* (1986) 183 Cal.App.3d 1265, 1270 [228 Cal.Rptr. 705].) "In determining whether an arrested driver's conduct amounts to a refusal to

---

[6] If the right affected by an administrative hearing is vested, "the decision is reviewed by means of a limited trial de novo in which the trial court not only examines the record for errors of law but also exercises its independent judgment upon the weight of the evidence produced before the administrative agency together with any further evidence properly admitted by the court. [Citations.]" (*Merrill v. Department of Motor Vehicles* (1969) 71 Cal.2d 907, 914 [80 Cal.Rptr. 89, 458 P.2d 33], italics & fns. omitted (*Merrill*); see Code Civ. Proc., § 1094.5, subd. (c) ["in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence"].) Suspension or revocation of an existing license affects such a "vested" right. (*Merrill*, at p. 915.)

submit to a test, the court looks not to the state of mind of the arrested driver, but to 'the fair meaning to be given [the driver's] response to the demand he submit to a chemical test.' [Citations.]" (*Payne v. Department of Motor Vehicles, supra,* 235 Cal.App.3d at p. 1518, last brackets added.)

The trial court found that Garcia failed or refused to complete a chemical test after being requested to do so by McNamara. Garcia attempts to focus this court's attention solely on his conduct at the jail. However, the trial court specifically stated: "*viewed in its totality,* [Garcia's] conduct amounted to a refusal to submit to a chemical test . . . ." (Italics added.)

Garcia remained silent and refused to choose a test after McNamara repeatedly asked Garcia which test he wanted at the scene of the arrest. This conduct alone was sufficient to constitute refusal to submit to a chemical test. (*Buchanan v. Department of Motor Vehicles* (1979) 100 Cal.App.3d 293, 299 [160 Cal.Rptr. 557] (*Buchanan*) [evidence of the arrestee's silence when asked whether he wanted blood test, breath test, or urine test supports finding arrestee refused to submit to chemical test].)[7] Furthermore, Garcia also failed to complete the breath test after being repeatedly warned that his failure to do so would constitute a refusal. The record shows that Garcia tried ineffectually to blow once and then refused or declined to try any further. The trial court did not find that Garcia was "incapable, or state[d] that he . . . [was] incapable, of completing the chosen test . . . ." (§ 23612, subd. (a)(2)(A).) In fact, the trial court did not find credible Garcia's testimony that he was unable to complete the test because of nausea.

Garcia argues that his failure to complete the breath test was insufficient to justify suspension of his driver's license in the absence of an explicit, verbal refusal or conditional agreement. His point is not well taken. Section 13353, subdivision (a)(1), itself provides: "If a person refuses the officer's request to submit to, *or fails to complete,* a chemical test or tests pursuant to Section 23612, upon receipt of the officer's sworn statement that the officer had reasonable cause to believe the person had been driving a motor vehicle in violation of Section 23140, 23152, or 23153, and that the person had refused to submit to, *or did not complete,* the test or tests after being requested by the officer, the department shall do one of the following: [¶] (1) Suspend the person's privilege to operate a motor vehicle for a period of one year." (Italics added; see also *Noli v. Department of Motor Vehicles* (1981) 125 Cal.App.3d 446, 448–449 [178 Cal.Rptr. 5] [arrestee's lack of cooperation in

---

[7] Although Garcia previously stipulated to having received the proper admonishment, Garcia now argues, in his reply brief, that there was no evidence that McNamara properly admonished Garcia on the consequences of refusal at the arrest scene. However, Garcia's own testimony suggests otherwise. Accordingly, Garcia has failed to preserve this issue for appeal.

completing urine test, despite verbal consent, justified officer's conclusion of refusal].) Substantial evidence supports the trial court's findings.

C. *Was Garcia's Refusal or Failure to Complete the Breath Test Vitiated by His Belated Compliance with a Blood Test?*

■ Garcia also contends that the trial court erred by holding that Garcia could not change his mind and elect a blood test before attempting the breath test. This is a question of law, which we review de novo. (*Brierton v. Department of Motor Vehicles, supra*, 130 Cal.App.4th at p. 508.) Garcia cites no authority supporting his argument that an arrestee can refuse any test, then agree to the officer's choice of test, fail to complete that test, and avoid the consequences of his prior conduct by agreeing to take an initially rejected test. In fact, although no published Court of Appeal opinion has addressed these precise factual circumstances, the authority is clear that delayed submission to a chemical test does not allow an arrestee to avoid the consequences of an initial refusal.

In *Zidell v. Bright, supra*, 264 Cal.App.2d 867 (*Zidell*), the arrestee initially refused to submit to any chemical test. Thereafter, the arresting officer left the police station to resume other duties. Thirty to 45 minutes after his initial refusal, the arrestee stated that he had changed his mind and would submit to a test. The arresting officer was called, but refused to return to the station. No test was given. (*Id.* at p. 869.) The reviewing court upheld suspension of the driver's license for refusal to submit to a chemical test. (*Id.* at pp. 869–870.) The court reasoned: "It would be inconsistent with the purpose of the statute to hold that either [the arresting officer], or the officers on duty at the police station, were required to turn aside from their other responsibilities and arrange for administration of a belated test when once appellant had refused to submit after fair warning of the consequences." (*Id.* at p. 870.)

In *Skinner v. Sillas, supra*, 58 Cal.App.3d 591 (*Skinner*), the arrestee initially elected to take a urine test, but then told the arresting officer to "[t]ake [his] fucking bottle and shove it" when escorted to the urinal. The arresting officers concluded that the arrestee had refused a chemical test. Nonetheless, a urine sample was ultimately taken from Skinner more than four hours later. (*Id.* at p. 594.) The reviewing court rejected the arrestee's argument that he complied with the implied consent law (§ 13353) because he did in fact perform a urine test. (58 Cal.App.3d at p. 597.) The court observed: "If the driver elects to take one of the three tests, he must complete the test or he will be deemed to have refused and failed to take it. [Citations.] And, too, once the suspect refuses to take one of the three tests, blood, urine,

or breath, there is no requirement that the officers thereafter give him a test when he decides he is ready. [Citation.]" (*Id.* at p. 598.) The court reasoned: "The purpose of the statute is to take the test as soon as possible after arrest and discover the suspect's blood-alcohol content at the time he was arrested for driving under the influence [citation], since alcohol in the blood system dissipates quickly [citation]." (*Id.* at p. 599.)

Having already concluded that substantial evidence supports the trial court's finding that Garcia refused a chemical test, we reject Garcia's attempts to distinguish *Zidell* and *Skinner* on the ground that there were unequivocal refusals by the defendants in those cases. Nor are we persuaded that, because Garcia's delay in providing a blood sample was less than an hour,[8] McNamara, unlike the arresting officers in *Skinner* and *Zidell*, was obligated to provide Garcia with another opportunity to comply with the implied consent law. The delay between Garcia's initial refusal and his compliance with a blood test was certainly shorter than the four hours at issue in *Skinner, supra,* 58 Cal.App.3d at pages 598–599. Nonetheless, " '[i]t is a matter of common knowledge that the intoxicating effect of alcohol diminishes with the passage of time. In a matter of a few hours an intoxicated person may "sober up." The efficacy of a blood test depends upon its being made as soon as possible after the time of the offense. To be of any probative value the test must be "near" to the offense in point of time. If it is not taken promptly after the arrest, it proves nothing.' [Citations.]" (*Ibid.,* fn. omitted.) And, contrary to Garcia's suggestion, the delay at issue here was not dissimilar to what he characterizes as a "lengthy time delay" at issue in *Zidell* (30 to 45 minutes in that case). (*Zidell, supra,* 264 Cal.App.2d at p. 869.)

The facts here are also similar to those presented in *Buchanan, supra,* 100 Cal.App.3d 293. In *Buchanan,* the arrestee was advised of his choice of tests at the time of arrest. The arrestee told the officer that he would select a test when they reached the police station. The officer informed him that he could not wait if he wanted to choose a blood test because the test would be administered at a hospital en route to the police station. The officer explained that if the arrestee did not choose a blood test before the police car reached

---

[8] Garcia was arrested at 12:43 a.m. and asked to choose a test while still at the scene. Garcia initially refused to choose a test and then agreed to take a breath test only when McNamara selected such a test. However, Garcia waited until he had been transported to the county jail for the breath test and undergone the 15-minute wait necessary for the breath test before he voiced his request for a blood test, at approximately 1:15 a.m. Blood was drawn at 1:50 a.m. Contrary to Garcia's suggestion, the record shows that McNamara summoned a phlebotomist immediately after Garcia failed to complete the breath test, which was approximately five minutes after Garcia requested a blood test. Thus, Garcia's attempt to shift responsibility for the delay is unsuccessful.

the hospital, the blood test " 'would be out' " because he would not be taken back to the hospital once he reached the police station, which was about three miles beyond the hospital. The arrestee continued to state that he would choose at the police station. (*Id.* at p. 296.) Once the arrestee arrived at the police station, he was advised that his choices were limited to a breath test or a urine test. The arrestee stated that he wanted a blood test and refused to respond to the officer's inquiries regarding a breath or urine test. (*Ibid.*)

On appeal, the reviewing court noted that only certain statutorily enumerated persons can withdraw blood,[9] "and they are to be found in a hospital, not at a police station." (*Buchanan, supra,* 100 Cal.App.3d at p. 298.) The court also emphasized that "the efficacy of a blood test depends on its being made as soon as possible after the time of the offense . . . ." (*Ibid.*) Accordingly, the court concluded that the arresting officer had the authority to require the arrestee to choose a blood test before reaching the hospital and to limit the arrestee's choices at the station to a breath test or a urine test. "[T]he arrestee is given the right to choose among the three tests, but he is not given the further right to specify when the test which he has chosen is to be administered." (*Ibid.*) Finally, the court concluded that the arrestee's silence when asked, first, whether he wanted a blood test, and, later, whether he wanted a breath or a urine test, constituted evidence that he refused a chemical test. "A motorist's silence in the face of a police officer's repeated requests that he submit to a chemical test and that he choose a test to determine the alcohol content of his blood, constitutes a refusal to submit to a chemical test under section 13353. [Citation.]" (*Id.* at p. 299.)

Here, Garcia's choice was statutorily limited to a blood or a breath test. (§ 23612, subd. (a)(2)(A).) McNamara properly advised Garcia of that choice after his arrest. Garcia remained silent and refused to choose a test. When Garcia agreed to McNamara's selection of a breath test, while seated in the patrol car, McNamara advised Garcia that if he did not cooperate and perform *the breath test* as ordered, it would be considered a refusal and Garcia would lose his driving privileges for a year. Similar to the arrestee in *Buchanan,* Garcia did not voice any request for a blood test until he arrived at the county jail.

*Buchanan* held that the police have the authority to determine when a particular chemical test may be taken, and have no obligation to offer the test

---

[9] Section 23158, subdivision (a), currently provides in relevant part: "only a licensed physician and surgeon, registered nurse, licensed vocational nurse, duly licensed clinical laboratory scientist or clinical laboratory bioanalyst, a person who has been issued a 'certified phlebotomy technician' certificate pursuant to Section 1246 of the Business and Professions Code, unlicensed laboratory personnel regulated pursuant to Sections 1242, 1242.5, and 1246 of the Business and Professions Code, or certified paramedic acting at the request of a peace officer may withdraw blood for the purpose of determining the alcoholic content therein."

again after the arrested person refuses to take it at the offered time. (*Buchanan, supra*, 100 Cal.App.3d at p. 298.) McNamara had the authority to require Garcia to choose a blood test before the patrol car departed for the jail and to limit Garcia's choice at the jail to a breath test. We reject Garcia's argument that an exception should be made here because a phlebotomist fortuitously happened to be available at the jail within half an hour of Garcia's failure to complete the breath test. Garcia argues that an arrestee should be allowed to change his or her mind if the arresting officer is not required to then take the arrestee to a different location to perform the newly requested test. Any such rule would be unworkable in practice and only encourage gamesmanship like that evidenced in this case. Accordingly, the trial court did not err by concluding that Garcia's change of mind regarding a blood test and his eventual consensual submission to such a test did not obviate the consequences of Garcia's initial refusal and failure to complete the breath test.

Garcia misplaces his reliance on *Hildebrand, supra*, 152 Cal.App.4th 1562, *Cahall, supra*, 16 Cal.App.3d 491 and *Quesada v. Orr, supra*, 14 Cal.App.3d 866 (*Quesada*). Garcia relies on *Hildebrand, Cahall*, and *Quesada* to support his argument that an arrestee can only be deemed to have refused a chemical test when an arrestee, after failing to complete one test, then further refuses to submit to an alternative chemical test. These cases fail to support his position.

In *Cahall, supra*, 16 Cal.App.3d 491, the defendant consented to a urine test and was informed that two samples of urine would be required to constitute a complete test. He gave the first sample, but later said that he was "unable to furnish the second specimen because he was a diabetic and, as such, did not drink many fluids." (*Id.* at p. 494.) When the defendant's further attempt to provide a second sample proved unsuccessful, the arresting officer asked him to submit to either a blood or breath test. The arrestee responded by saying " 'I'm not even going to give you an answer.' " (*Id.* at pp. 494–498.) The only issue on appeal was whether there was substantial evidence to sustain the administrative finding that the appellant refused to submit to a chemical test. (*Id.* at p. 494.)

The court rejected the arrestee's contention that "the giving of one urine specimen was sufficient to comply with the provisions of the law . . . ." (*Cahall, supra*, 16 Cal.App.3d at p. 496.) The court observed: "While he may choose the type of test, the driver's obligation does not end when he has expressed such a choice. He must go further and *submit* to the test. . . . [¶] . . . [¶] . . . The giving of a partial urine sample obviously did not satisfy the requirements of the law." (*Id.* at pp. 495–496.) The court went on to say "Upon [the arrestee's] inability to comply with the requirements of the statute by providing the second urine sample, he was obliged, upon request so to do, to select another with which he could comply. Not having done so, he refused

a 'request to submit to a chemical test' [citation] and brought upon himself the penalty of the statute. [Citation.]" (*Id.* at p. 496.)

*Quesada, supra,* 14 Cal.App.3d 866 is similar. In *Quesada,* the defendant chose to submit to a urine test, but did not complete the test, claiming he was too modest to produce a urine specimen while the arresting officer and a laboratory attendant stood five or six feet away. After blood and breath tests were again offered, the arrestee refused to take either test. (*Id.* at pp. 868–869.) The arrestee argued on appeal that "since he was physically unable to take the test of his own choosing, 'he should not have to choose another test or be deemed to have refused.' " (*Id.* at p. 870.) The court rejected this argument, noting "[w]hile he may choose the type of test, the driver's obligation does not end when he has expressed such a choice. He must go further and *submit* to the test." (*Ibid.*) Accordingly, the court concluded: "[U]pon [the arrestee's] inability to submit to the type of chemical test chosen by him, he was obliged, upon request so to do, to select another with which he could comply. Not having done so he refused a 'request to submit to a chemical test' [citation] and brought upon himself the penalty of the statute." (*Id.* at p. 871.)

In *Hildebrand, supra,* 152 Cal.App.4th 1562, an arrestee appealed from the trial court's denial of his petition for writ of mandate, contending that the evidence was insufficient to support the trial court's finding that he had refused to complete a chemical test after admonishment. (*Id.* at p. 1565.) The arrestee chose a breath test, but was unable to complete all portions of the test because he "puffed out his cheeks while placing his tongue on the end of the mouthpiece, and he would not blow hard enough to make the machine sound for eight to 10 seconds." After numerous attempts, the arrestee said " 'I'm blowing as hard as I can. If that's not good enough . . . too bad. And I'm not taking any other tests.' " (*Id.* at p. 1566, original ellipsis.) The officer then told the arrestee he was required to give a blood sample because he did not complete the breath test. The arrestee responded: " 'I'm not giving a blood sample. You got what you got now let me go!' " A forced blood draw was later taken. (*Id.* at pp. 1566–1567.)

The arrestee argued on appeal that he was not properly admonished regarding the consequences of a refusal before the breath test was adminis-tered or before any refusal. (*Hildebrand, supra,* 152 Cal.App.4th at p. 1573.) The court concluded that adequate admonishments were given because the officer told the arrestee he had a choice of tests before the breath test was attempted and, after the failed test, the arresting officer informed the arrestee of the consequences of a refusal. (*Id.* at pp. 1573–1574.) Hildebrand also argued that the police were obligated to offer him a new choice of tests after he failed to complete the breath test. (*Id.* at p. 1574.) The court concluded

that the officer could have reasonably interpreted the arrestee's statements after the failed breath test and his intentional frustration of the breath test as a refusal to complete any offered tests. Accordingly, the court concluded that substantial evidence supported the trial court's finding that the arrestee refused a chemical test. (*Id.* at p. 1574.)

■ The reviewing court observed: " '[T]he law of implied consent mandates that an arrestee is required to submit to and complete one of the three tests upon their first having been offered to him by an arresting officer. [¶] . . . [¶] . . . It is the initial refusal which forms the basis for suspension of the driver's license under Vehicle Code section 13353. [Citation.] Once the driver refuses to take any one of the three chemical tests, the law does not require that he later be given one when he decides, for whatever reason, that he is ready to submit. [Citations.] [¶] . . . Simply stated, one offer plus one rejection equals one refusal; and, one suspension.' [Citations.]" (*Hildebrand, supra,* 152 Cal.App.4th at p. 1573, last brackets added.)

The defendants in *Hildebrand, Cahall,* and *Quesada* were offered alternative tests after they failed to complete an initially selected test. (*Hildebrand, supra,* 152 Cal.App.4th at p. 1566; *Cahall, supra,* 16 Cal.App.3d at p. 494; *Quesada, supra,* 14 Cal.App.3d at p. 869.) In each of those cases, the evidence showed *both* failure to complete one test, as well as a subsequent refusal to take another. In each case the argument presented by the defendant was that he could not be *required* to consent to another test after alleged inability to complete a first. That argument was rejected in each instance. (See also § 23612, subd. (a)(2)(A) ["[i]f the person arrested either is incapable, or states that he or she is incapable, of completing the chosen test, the person shall submit to the remaining test"].) None of these cases hold, as Garcia urges us to do here, that a defendant is entitled to a second bite at the apple after rejecting the first. To the extent that either *Cahall* or *Quesada* can be read to suggest such a result, we disagree.

" 'It is the initial refusal which forms the basis for suspension of the driver's license under . . . section 13353. [Citation.]' " (*Hildebrand, supra,* 152 Cal.App.4th at p. 1573, ellipsis added; see *Dunlap v. Department of Motor Vehicles* (1984) 156 Cal.App.3d 279, 283 [202 Cal.Rptr. 729]; *Barrie v. Alexis* (1984) 151 Cal.App.3d 1157, 1162 [199 Cal.Rptr. 258].) The same rule applies even if the arrestee quickly changes his or her mind and consents to a test. (*Barrie v. Alexis,* at p. 1163; *Zidell, supra,* 264 Cal.App.2d at p. 869.) We agree with the conclusion of *Hildebrand* that " 'one offer plus one rejection equals one refusal; and, one suspension.' " (*Hildebrand,* at p. 1573.)

■ Accordingly, Garcia's license was properly suspended.

## III. Disposition

The judgment is affirmed. Respondent is to recover its costs on appeal.

Jones, P. J., and Simons, J., concurred.